IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN BELLUSA,<br><br>            Plaintiff,<br><br>      v.<br><br>BOARD OF EDUCATION OF THE OAKLAND UNIFIED SCHOOL DISTRICT, et al.,<br><br>            Defendants. | Case No.: C-13-2930 JSC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (Dkt. No. 24)** |

Plaintiff Jonathan Bellusa, an Oakland Unified School District ("OUSD" or "District") police sergeant, alleges retaliation in violation of state and federal law by Defendants, the District's Board of Education, Jacqueline Minor, the District's General Counsel, Anthony Smith, the District Superintendent, Peter Sarna, the former District Chief of Police, and James Williams, the Interim District Chief of Police. Defendants move to dismiss Plaintiff's First Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Having carefully considered the parties' submissions, and having had the benefit of

oral argument on December 5, 2013, the Court DENIES in part and GRANTS in part Defendants' motion with leave to amend.[1]

## ALLEGATIONS OF THE COMPLAINT

On January 22, 2011, Plaintiff, a District police officer, and another officer, Sergeant Barhin Bhatt, conducted a traffic stop of a vehicle on Joaquin Miller Road in Oakland, California. While the vehicle was stopped, Bhatt fired approximately seven shots at Raheim Brown, a passenger in the vehicle, who subsequently died of his injuries. (FAC ¶¶ 1, 17.) While Plaintiff was being interviewed at the Oakland Police Department ("OPD") headquarters following the incident, he and Bhatt were questioned by District Superintendent Anthony Smith and District General Counsel Jacqueline Minor "in a manner that compromise[ed]…the interviews by OPD investigators." (FAC ¶ 18.) From that date forward "OUSD officials and their attorneys have attempted to coerce Sergeant Bellusa into conforming his account of the shooting of Raheim Brown to that of Sergeant Bhatt, despite Sergeant Bellusa's disagreement with Sergeant Bhatt's account." (FAC ¶ 19.)

Nearly five months after the shooting, former District Police Chief "Sarna engaged in a drunken, racist rant in which he grossly insulted OUSD Sergeant Michael Anderson and made racist remarks concerning African American and Asian American individuals. He also called Sergeant Bellusa a 'nigger,' called Officer Greg Hom a 'gook' and threatened to kill them." (FAC ¶ 23.) Although Sergeant Anderson reported Sarna's actions to District police department employee Lou Silva, no action was taken on Anderson's complaint. (*Id*.) A month later, Sarna made another racist remark regarding Sergeant Anderson. (*Id*. ¶ 24.) Plaintiff thereafter filed a written complaint with District General Counsel Minor concerning Sarna's racially discriminatory behavior and Silva's failure to report the incident. (*Id*. ¶ 25.) At the time Plaintiff filed the complaint with Minor he also attempted to speak with her regarding the shooting incident, but Minor ordered Plaintiff to leave her office. (*Id*. ¶ 26.)

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.SC. § 636(c).

Later that day, Minor advised District Superintendent Smith and former Chief Sarna of Plaintiff's complaint and Sarna then telephoned Plaintiff to discuss the complaint. (*Id*. ¶ 27.) Smith and Minor thereafter accused Plaintiff of making false allegations regarding Sarna. (*Id*. ¶ 28.) Minor told police officers during a line-up that she did not believe the allegations against Sarna and Smith is alleged to have told a District board member that Plaintiff was "trying to screw the chief." (*Id*.)

The next day Sarna was formally placed on administrative leave and Sergeant Bhatt, the other officer involved in the January 22, 2011 shooting, was appointed as Interim OUSD Police Chief. (*Id*. ¶ 29.) Nonetheless, Superintendent Smith subsequently told District police officers that he was continuing to speak with Sarna "because he is still the chief." (*Id*. ¶ 31.) Six days after he filed his complaint, Plaintiff was informed by then Acting Chief Bhatt that he was being relieved of all supervisory responsibilities at Smith's direction. (*Id*. ¶ 32.) Throughout the following month, the District conducted an internal investigation into the allegations against Sarna during which General Counsel Minor is alleged to have interrogated District police officers regarding Plaintiff's prior conduct asking if he had "'ever done anything inappropriate.'" (*Id*. ¶ 33.)

Around this same time, the *San Francisco Chronicle* published an article regarding the incident with Sarna and his suspension entitled "Top schools cop suspended in slur probe." (*Id.* ¶ 34.) The article quoted District officials minimizing the incident and suggesting that Sarna had only used the racial epithet in an off-hand manner and not directed at anyone in particular. (*Id*.) In response to the article, Plaintiff's attorney held a press conference rebutting the District's statements and detailing Plaintiff's complaint against Sarna. The press conference was picked up by a local ABC affiliate and print media including *Bay Citizen* and a local affiliate of the *New York Times*. (*Id*. at ¶¶ 35-36.)

A day after the news stories regarding the Sarna incident, the District announced that Sarna had retired and that he had written a letter to the President of the School Board admitting to his actions. (*Id*. at ¶ 38.) Shortly thereafter acting Chief Batt informed Plaintiff that he should now report to Lou Silva, a known ally of Sarna and the individual who had

3

previously failed to report Sergeant Anderson's complaint of racial discrimination. (*Id*. at ¶ 39.)

During this same time period, Plaintiff began to feel serious physical and mental strain as a result of the January 22, 2011 shooting and subsequent proceedings, the incident with Sarna, and the general hostile work environment within the District police department. (*Id*. at ¶ 37.) Plaintiff sought medical attention and began to receive treatment. (*Id*.) Plaintiff also filed complaints with the District alleging that he was suffering retaliation because of his complaints regarding Sarna and the shooting. (*Id*. at ¶ 40.) Shortly after filing the complaints, Plaintiff's doctor recommended that he be placed on medical leave due to his mental and physical stress and then be re-evaluated for duty two weeks later. (*Id*. at ¶ 41.) The next day, September 1, the District announced that it would be conducting an investigation of the police department led by Pete Peterson, a known ally of Sarna. (*Id*. at ¶ 42.) The following day Peterson placed Plaintiff on medical leave. (*Id*. at ¶ 42.) He took Plaintiff's duty weapon, badge, and other work-related equipment, and other items at the instruction of General Counsel Minor and/or Superintendent Smith. (*Id*. ¶ 43.)

On September 6, 2011 James Williams was named Interim Police Chief, taking over for Sergeant Bhatt. (*Id*. at ¶ 44.) Williams immediately notified Plaintiff that "he was the subject of an OUSD Internal Affairs investigation into accusations that he had 'engaged in unprofessional/disgraceful conduct against others, sexual harassment/hostile work environment, breach of supervision responsibilities (as described in OSPD Policy 340.3.8), and falsification of work-related records.'" (*Id*. at ¶ 45.) Peterson was placed in charge of the investigation of Plaintiff. (*Id*.) During this time former Chief Sarna continued to communicate with District agents and officials, including Bhatt and Peterson, in an effort to retaliate against Plaintiff. (*Id*. at ¶ 46.)

Plaintiff's two-week medical leave was extended after he was admitted to the hospital complaining of chest pains. While he was on medical leave, Plaintiff was notified that the family of Raheim Brown had filed a lawsuit regarding the January 22, 2011 shooting and that the District would provide separate counsel for Bhatt and Plaintiff. (*Id*. at ¶ 49.) Plaintiff's

4

counsel in that lawsuit, Jeff Olsen, advised Plaintiff that he should not disclose certain issues regarding the shooting or else Olsen "would have to report the issues to counsel for Sarna, Bhatt, and the District." (*Id*. at ¶ 50.) Plaintiff subsequently refused to sign the verified answer to the wrongful death complaint because the facts therein diverged from Plaintiff's recollection of events. (*Id*. at ¶ 51.) Later, when Plaintiff indicated that he was not comfortable sharing his version of events with the District, Olsen accused Plaintiff of "maliciously causing the district harm" and threatened that if he did not share the requested information he would become liable for attorneys' fees, and that the District could file a lien against him. (*Id*. at ¶ 54.) Olsen also advised Plaintiff that his version of events was significantly different from Bhatt's and that "it was his duty to warn Bellusa of certain 'consequences' of his testimony." (*Id*. at ¶ 55.) Olsen also implied that Plaintiff could become liable for the wrongful death claims. (*Id*. at ¶ 56.)

Plaintiff ultimately agreed to allow Olsen to share his version of events with the District-hired counsel for Bhatt and Sarna (James Marzan and Peter Edrington). Olsen subsequently told Plaintiff that even if he told the truth he could end up "sitting in jail" as a result of his testimony. (*Id*. at ¶ 59.) Olsen also informed Plaintiff of a conversation he had with Peter Edrington, counsel for Bhatt and Sarna, wherein Edrington asked why Plaintiff was not "playing ball," and would not just "go along with Bhatt," and instead, "want[ed] to sink ships." (*Id*. at ¶ 60.) Olsen subsequently advised Plaintiff that Edrington was preparing to ask the Alameda County District Attorney to file perjury charges against Plaintiff. (*Id*. at ¶ 61.) Plaintiff was also again informed that the District was considering requiring him to pay for his own legal defense. (*Id*. at ¶ 63.)

Four days after this last conversation with Olsen, Plaintiff called 911 because he believed he was having a heart attack. Although it was not a heart attack, the heart pain was attributed to extreme anxiety. (*Id*. at ¶ 64.)

Throughout this time period Plaintiff was ordered to submit to fitness for duty examinations on three separate occasions. (*Id*. at ¶¶ 53, 62, 67.) Plaintiff's paid administrative leave was rescinded in August 2012. (*Id*. at ¶ 66.)

counsel in that lawsuit, Jeff Olsen, advised Plaintiff that he should not disclose certain issues regarding the shooting or else Olsen "would have to report the issues to counsel for Sarna, Bhatt, and the District." (*Id*. at ¶ 50.) Plaintiff subsequently refused to sign the verified answer to the wrongful death complaint because the facts therein diverged from Plaintiff's recollection of events. (*Id*. at ¶ 51.) Later, when Plaintiff indicated that he was not comfortable sharing his version of events with the District, Olsen accused Plaintiff of "maliciously causing the district harm" and threatened that if he did not share the requested information he would become liable for attorneys' fees, and that the District could file a lien against him. (*Id*. at ¶ 54.) Olsen also advised Plaintiff that his version of events was significantly different from Bhatt's and that "it was his duty to warn Bellusa of certain 'consequences' of his testimony." (*Id*. at ¶ 55.) Olsen also implied that Plaintiff could become liable for the wrongful death claims. (*Id*. at ¶ 56.)

Plaintiff ultimately agreed to allow Olsen to share his version of events with the District-hired counsel for Bhatt and Sarna (James Marzan and Peter Edrington). Olsen subsequently told Plaintiff that even if he told the truth he could end up "sitting in jail" as a result of his testimony. (*Id*. at ¶ 59.) Olsen also informed Plaintiff of a conversation he had with Peter Edrington, counsel for Bhatt and Sarna, wherein Edrington asked why Plaintiff was not "playing ball," and would not just "go along with Bhatt," and instead, "want[ed] to sink ships." (*Id*. at ¶ 60.) Olsen subsequently advised Plaintiff that Edrington was preparing to ask the Alameda County District Attorney to file perjury charges against Plaintiff. (*Id*. at ¶ 61.) Plaintiff was also again informed that the District was considering requiring him to pay for his own legal defense. (*Id*. at ¶ 63.)

Four days after this last conversation with Olsen, Plaintiff called 911 because he believed he was having a heart attack. Although it was not a heart attack, the heart pain was attributed to extreme anxiety. (*Id*. at ¶ 64.)

Throughout this time period Plaintiff was ordered to submit to fitness for duty examinations on three separate occasions. (*Id*. at ¶¶ 53, 62, 67.) Plaintiff's paid administrative leave was rescinded in August 2012. (*Id*. at ¶ 66.)

## LEGAL STANDARD

A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotations and citations omitted); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.").

Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), under which a party is only required to make "a short and plain statement of the claim showing that the pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555.) "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively"), *cert. denied*, 132 S. Ct. 2101 (2012). The court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64.

6

**DISCUSSION**

Plaintiff's FAC alleges six causes of action: (1) retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., (2) retaliation in violation of 42 U.S.C. § 1983, (3) retaliation in violation of California Labor Code § 1102.5, (4) violation of the Reporting by School Employees of Improper Government Activities Act, California Education Code §§ 44110-44114, (5) violation of the Bane Act, California Civil Code § 52.1, (6) and intentional infliction of emotional distress in violation of California Government Code § 815.2. Defendants move to dismiss Plaintiff's FAC in its entirety contending that Plaintiff's claims fail to state a claim upon which relief could be granted and that the allegations underlying the claims are barred by the litigation privilege set forth in California Civil Code Section 47(b).[2]

**A.      Retaliation under Title VII against the District**

Plaintiff first alleges that he was retaliated against in violation of Title VII for making a formal complaint of discrimination about former Chief Sarna. (FAC ¶ 75.) A prima facie case of retaliation requires the plaintiff to show that: (1) he engaged in a protected activity; (2) he suffered a materially adverse action; and (3) there was a causal relationship between the two. *See Westendorf v. W. Coast Contractors of Nev., Inc.,* 712 F.3d 417, 421 (9th Cir. 2013). An employee engages in a protected activity when he opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law. *See Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); 42 U.S.C. § 2000e–3(a). In the Title VII context, the adverse action element is present when "a reasonable [person] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [person] from making or supporting a charge of

---

[2] Defendants initially argued that the litigation privilege barred Plaintiffs from relying on any comments made by any of the attorneys for the District (Messrs Olsen, Edrington and Marzan) with respect to his federal and state law claims. On reply, Defendants concede, as they must, that it does not bar Plaintiff's federal claims under Section 1983 or Title VII. *Kimes v. Stone*, 84 F.3d 1121, 1127 (9th Cir. 1996) ("the litigation immunity provided in Cal. Civ. Code § 47(b) does not apply to [Plaintiffs'] § 1983 cause of action.").

7

discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citations omitted).

The District does not dispute that Plaintiff's complaints regarding Defendant Sarna's conduct constitute protected activity; rather, the District contends that Plaintiff's retaliation claim fails because Plaintiff has not adequately pled an adverse employment action or a causal connection between the protected activity and the adverse employment action. The Court disagrees. Plaintiff's claim that he was relieved of supervisory responsibilities following his complaint about Sarna (FAC ¶ 32) is sufficient at this stage to plead an adverse employment action. *See Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002) (noting that reduction of responsibilities; imposition of additional burdensome tasks; transfers of job duties; and undeserved performance ratings are examples of adverse employment decisions) (internal citations omitted).

The District next contends that Plaintiff has failed to demonstrate an adequate causal connection between his complaints and the adverse employment action. "[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (finding sufficient evidence of causation where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended). Here, Plaintiff alleges that he filed a written complaint regarding Sarna's allegedly racially discriminatory behavior with General Counsel Minor on August 4, 2011 and then six says later—on August 10, 2011—Plaintiff was relieved of all supervisory responsibilities. (FAC ¶¶ 25, 32.) Even without the allegations that during the intervening timeframe Minor and Superintendent Smith accused Plaintiff of making false allegations and told another individual that he was "trying to screw the chief," this timing supports an inference of a causal connection between the protected activity and the adverse employment action. (FAC ¶ 28.)

Accordingly, the District's motion to dismiss Plaintiff's claim for retaliation under Title VII is denied.

### B.     Retaliation under 42 U.S.C. § 1983 against the individual defendants

Plaintiff's second cause of action alleges that each of the individual defendants retaliated against him in violation of 42 U.S.C. § 1983 for exercising his First Amendment rights to speak out about a matter of public concern—the racially discriminatory conduct of Sarna.  (FAC ¶ 77.)  Plaintiff identifies his attorney's press conference "rebutting some of the District's allegations regarding the [Sarna] incident and explaining the substance of Bellusa's discrimination complaint" which was picked up by print and television media as his exercise of his First Amendment rights.

To prevail on a claim of First Amendment retaliation under Section 1983, Plaintiff "must provide evidence showing that by his actions the defendant deterred or chilled the plaintiff's political speech and such deterrence was a substantial or motivating factor in the defendant's conduct."  *Mendocino Envt'l Ctr. v. Mendocino County*, 192 F.3d 1283, 1300 (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994) (internal quotation marks and alterations omitted)).  The Court engages in a five-step inquiry:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (internal citations and quotation marks omitted).  "To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind.  Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden."  *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003). The relevant inquiry is whether the action is "reasonably likely to deter employees from engaging in protected activity."  *Id*. at 976.

Although Defendants initially argued that the claim must be dismissed because the statements were not personally made by Plaintiff, they have since withdrawn this argument. "[W]hen a lawyer speaks on behalf of a client, the lawyer's right to speak is almost always grounded in the rights of the client, rather than any independent rights of the attorney. *Eng*, 1067 (internal citations and quotation marks omitted). Thus, "[t]here can be little doubt, then, that state action designed to retaliate against and chill an attorney's advocacy for his or her client strikes at the heart of the First Amendment." *Id.* at 1069 (internal citations and quotation marks omitted). Defendants instead contend that Plaintiff's Section 1983 claim fails because he has not alleged that each defendant deprived him of a guaranteed right.

Plaintiff alleges that the following actions give rise to liability:

- On August 18, 2011, a hostile officer and Sarna ally, Lou Silva, was appointed as Bellusa's supervisor, FAC ¶ 39;
- On September 1, 2011, another Sarna ally, Pete Peterson, was hired to investigate the District police, FAC ¶ 42;
- Peterson placed Bellusa on administrative leave on September 2, 2011, FAC ¶ 43;
- Defendant James Williams, as interim Police Chief, subjected Bellusa to an internal affairs investigation on September 7, 2011, FAC ¶ 45. Peterson, the Sarna ally, was hired to investigate Bellusa, FAC ¶ 45;
- Bellusa was subsequently subjected to various "fitness for duty" examinations, without justification and which precluded him from returning to active duty, FAC ¶¶ 53, 62, 66, 67.

(Dkt. No. 29, 18:27-19:11.) These allegations are not sufficient to state a claim against Smith, Sarna, or Minor. Plaintiff contends that Smith, as the Superintendent, can be held liable for the actions of his subordinates citing two out-of-circuit decisions. Neither case supports Plaintiff's claim that as the Superintendent Smith is liable for all of his subordinates' acts. Plaintiff has not alleged Smith ratified the other defendants' conduct; instead, Plaintiff appears to suggest that Smith must have approved of their conduct by virtue of his supervisory position. *See, e.g.*, *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (holding that "the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the decisionmaker acted as a rubber stamp, or the cat's paw, for the subordinate employee's prejudice.") (internal citations and quotation marks omitted); *Griffin*

*v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998) (holding that "evidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence.").

Plaintiff alleges that Sarna encouraged the retaliation through his allies Peterson and Silva, although Sarna was on administrative leave at the time of the allegedly retaliatory conduct. And Plaintiff contends that Minor can be held liable for the continuing pattern of retaliation in light of her earlier conspiracy with Smith and Sarna to retaliate against Plaintiff for filing his written complaint against Sarna. As the Ninth Circuit observed in *Dahlia v. Rodriguez*, No. 10-55978, 2013 WL 4437594 (9th Cir. Aug. 21, 2013):

> [P]ersonal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Id.* at n.22 (internal citations and quotation marks omitted). The FAC fails to sufficiently allege that Smith, Minor, or Sarna caused an adverse employment action based on Plaintiff's exercise of his First Amendment rights.

In contrast, Plaintiff's allegations as to Defendant Williams, the Interim Police Chief, are sufficient to state a claim. While Defendants quibble with the language Plaintiff uses to characterize Williams' conduct, the FAC alleges that "[o]n September 7, 2011, Chief Williams, without any proper justification for doing so, advised Sergeant Bellusa that he was the subject of an OUSD Internal Affairs investigation into accusations that he had 'engaged in unprofessional/disgraceful conduct against others, sexual harassment/hostile work environment, breach of supervision responsibilities (as described in OSPD Policy 340.3.8), and falsification of work-related records.'" (FAC ¶ 45.) Defendants have not argued that an internal affairs investigation cannot constitute an adverse action that would chill speech; instead, Defendants contend that as pled Plaintiff has not alleged that Williams personally "subjected Bellusa to an internal affairs investigation." (Dkt. No. 35 12:18-20.) The

allegations, viewed in the light most favorable to Plaintiff, support an inference that Williams caused the internal affairs investigation.

At oral argument, Plaintiff insisted that the FAC supports a plausible inference that Williams would not have initiated an internal affairs investigation without being told to do so by Minor or Smith. The Court agrees that given the allegation that Williams became interim police chief on September 6 and then initiated the internal affairs investigation on September 7, it appears others may have been involved in the decision. The FAC, however, does not include sufficient allegations to identify those others. Indeed, Plaintiff does not actually allege that Williams initiated the investigation at the prompting of either Smith or Minor. *See Starr v. Baca*, 652 F.3d 1202, 1214 (9th Cir. 2011) (denying motion to dismiss where complaint made "detailed factual allegations" demonstrating that sheriff had notice of subordinates' conduct and intentionally chose not to respond), *cert. denied,* 132 S. Ct. 2101 (2012). Thus, while the FAC's allegations are sufficient to tie the internal affairs investigation to Williams, they are insufficient as to the remaining defendants.

Accordingly, the motion to dismiss Plaintiff's Section 1983 claim is denied as to Williams, but granted with respect to Smith, Sarna, and Minor with leave to amend.

**C. California Labor Code § 1102.5 against the District**

California Labor Code Section 1102.5 is a "whistleblower" statute that prohibits an employer from retaliating against an employee for disclosing illegal action. Although Plaintiff does not identify which subsection of the Code applies to his claim, the Court presumes it is the subsection which provides that "an employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." Cal. Lab. Code § 1102.5(c). To state a prima facie case of retaliation under Section 1102.5(c), a plaintiff must establish: "(1) he engaged in protected activity; (2) his employer thereafter subjected him to an adverse employment action; and (3) a causal link between the two." *Federico v. Overland Contracting, Inc.*, No. 12-2588, 2013 WL 5516187, at *18 (N.D. Cal. Oct. 4, 2013). Here, Plaintiff's Section 1102.5 claim is predicated on (1) the same

allegations he relied on in support of his Title VII and Section 1983 retaliation claims, and (2) allegations that he refused to give false testimony regarding the shooting of Raheim Brown.

Defendants first move to dismiss relying on the arguments raised above regarding Plaintiff's retaliation claims under Title VII and Section 1983; namely, that Plaintiff has failed to allege an adverse employment action or any causal action between a protected activity and Defendants' conduct. As discussed above, the Court concludes that Plaintiff has adequately pled facts supporting his claim of an adverse employment action based on Plaintiff being relieved of his supervisory responsibilities immediately following his filing of a written complaint regarding Defendant Sarna, as well as Williams' initiation of an Internal Affairs investigation following Plaintiff's exercise of his First Amendment rights.

Defendants next challenge Plaintiff's claim that in March 2012 the attorneys hired by the District to represent Plaintiff and Bhatt in the wrongful death suit demanded that Plaintiff commit perjury and that he was retaliated against because of his refusal to do so. As an initial matter, Plaintiff's FAC identifies several actions that he contends were done in retaliation for Plaintiff's refusal to commit perjury (FAC ¶ 80); however, most of these acts occurred before March 2012 and thus could not have been done as a result of Plaintiff "resisting the District's demands that he alter his testimony." (*Id.*) The only post-March 2012 act identified by Plaintiff as an adverse employment action is subjecting Plaintiff to repeated fitness for duty examinations. Plaintiff, however, has not alleged sufficient facts to support an inference that these acts constituted adverse employment actions, especially since Plaintiff himself alleges that his physician placed him on medical leave. More must be alleged. Accordingly, Defendants' motion to dismiss Plaintiff's California Labor Code § 1102.5 claim is granted with leave to amend.

Another issue requires comment. Defendants appear to contend that due to the litigation privilege set forth in California Civil Code Section 47(b), Plaintiff cannot rely on statements made by the attorneys as evidence in support of this claim. The privilege "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that

13

have some connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal.3d 205, 266 Cal.Rptr. 638, 642, 786 P.2d 365, 369 (1990). "The principal purpose of [the litigation privilege] is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Kashian v. Harriman*, 98 Cal.App.4th 892, 913, 120 Cal.Rptr.2d 576 (2002) (internal quotation marks and citation omitted).  Thus, the litigation privilege grants "absolute immunity" from "all torts other than malicious prosecution, including fraud, negligence and negligent misrepresentation." *Harris v. King*, 60 Cal.App.4th 1185, 1188, 70 Cal.Rptr.2d 790 (1998).  However, "section 47(2) has never been thought to bar the evidentiary use of every 'statement or publication' made in the course of a judicial proceeding;" thus, "while section 47(2) bars certain tort causes of action which are predicated on a judicial statement or publication itself, *the section does not create an evidentiary privilege for such statements*."  *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal.3d 1157, 1168 (1986) (emphasis added); *see also Ambat v. City & Cnty. of San Francisco*, 693 F.Supp.2d 1130, 1145 (N.D. Cal. 2010) ("Section 47 prohibits the use of such statements as a basis for civil liability for certain torts, including defamation, but does not impose any limitation on evidentiary use of such statements, much less prohibit adverse employment actions based on such statements."). Accordingly, while Section 47(b) would serve to bar a tort claim against attorneys Olsen, Edrington and Marzan (who are not parties here), Defendants have not shown that it bars Plaintiff from relying on their statements as evidentiary support for his claims of retaliation.

**D.      California Education Code Section 44110-44114 against all Defendants**

Plaintiff's fourth claim is for violation of the Reporting by School Employees of Improper Government Activities Act, California Education Code §§ 44110-44114.  (FAC ¶ 82).  Defendants move to dismiss on three grounds:  (1) Plaintiff has failed to plead that he is a "public school employee" or "employee" as required and defined by the Government Code; (2) Plaintiff has failed to plead facts showing that the District or any of the individual Defendants committed the conduct alleged in support of this claim; and (3) the conduct of

1 Plaintiff's attorney and the attorneys for the District in a separate lawsuit cannot be imputed
2 to the Defendants.

3 The Court concludes that the claim is inadequately pled such that it cannot even reach
4 Defendants' arguments.  Plaintiff has not identified which provision or subdivision of the Act
5 under which he sues; nor has either party set forth the elements of a claim under the Act.
6 Accordingly, the motion to dismiss Plaintiff's claims under California Education Code
7 Section 44110-44 is granted with leave to amend.

### E. The Bane Act, California Civil Code Section 52.1, against all Defendants

The Bane Act, California Civil Code Section 52, provides a right to relief when someone "interferes by threats, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state."  The elements of a claim for relief are: 1) an act of interference with a legal right by 2) intimidation, threats or coercion.  *Haynes v. City and County of San Francisco*, 2010 WL 2991732, at *6 (N.D. Cal. Jul. 28, 2010); *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998).

Plaintiff contends that Defendants violated his rights under the Bane Act when they "threatened that Sergeant Bellusa would be 'sitting in jail' if he did not conform his testimony to the version proffered by Sergeant Bhatt regarding the shooting of Raheim Brown" and "threatened to seek a lien for attorneys' fees and to withhold indemnification of his actions pursuant to formal duties, both actions that would result in Bellusa's economic ruin." (FAC ¶ 84.)  Defendants respond that the claim fails as a matter of law because Plaintiff is precluded from relying on the statements of attorneys Olsen, Edrington, and Marzan under the litigation privilege.

Here, the Court agrees that the litigation privilege applies—the attorneys' statements provide the basis for liability as they are the "threat" required under Section 52.1.  Unlike Plaintiff's Section 1102.5 claim, the statements are not offered as evidence from which the Court can infer a basis for certain actions by the Defendants; rather, the statements provide an essential element of the offense and reliance on them would thus run afoul of the litigation

15

privilege. Plaintiff conceded as much at oral argument but argued that an exception should apply under *Fremont Reorganizing Corp. v. Faigin*, 198 Cal. App. 4th 1153, 1174 (2011), which holds "that the litigation privilege is inapplicable in an action by a former client against an attorney for breach of professional duties." Contrary to *Fremont*, however, Plaintiff has not sued Olsen for breach of his professional responsibilities; instead, Plaintiff seeks to impute Olsen's alleged breach of his professional responsibilities to the District. Plaintiff has not cited any authority for this proposition, and the Court is unaware of any. The Court declines to extend *Fremont's* rationale to this context.

Accordingly, the motion is granted as to the District based on the litigation privilege. As Plaintiff has failed to identify any acts of intimidation, threats, or coercion committed by Smith, Minor, Williams or Sarna, the motion is also granted as to the individual Defendants.

### G. Intentional Infliction of Emotional Distress

To adequately plead a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must allege four elements: "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering, and (4) actual and proximate causation of the emotional distress." *Dowell v. Contra Costa Cnty.*, 928 F. Supp. 2d 1137, 1156 (N.D. Cal. 2013) (internal quotation omitted). Plaintiff alleges that Defendants "took outrageous measures, including the abuse of District investigatory powers and threats of incarceration and economic ruin." (FAC ¶ 86.)

In his opposition, Plaintiff concedes that the claim is limited to the individual Defendants as the District as a public entity cannot be sued for a common law tort such as IIED. As for the individual Defendants, Plaintiff must plead conduct which is "so extreme as to exceed all bounds of that usually tolerated in a civilized society." *Schneider v. TRW, Inc.*, 938 F.2d 986, 992-93 (9th Cir. 1991) (finding that allegations that a supervisor screamed and yelled in the process of criticizing an employee's performance and threatened to throw the employee out of the department while making threatening gestures was not sufficient to

establish an IIED claim). Plaintiff identifies the following four categories of allegations as supporting his IIED claim:

- Defendants Smith and Minor accused Plaintiff of making false allegations regarding Chief Sarna. Defendant Minor told OUSD officers at a line-up that she did not believe the allegations against Chief Sarna (FAC ¶ 28);
- Defendant Smith stated that Plaintiff was "trying to screw the chief" in a conversation with an OUSD board member (FAC ¶ 28);
- District police commanders subjected Plaintiff to "various acts of retaliation including a demotion, an unwarranted Internal Affairs investigation, the appointment of hostile supervisors, and requiring Bellusa to submit to multiple fitness-for-duty examinations" (Dkt. No. 29, 26:11-15 citing FAC ¶¶ 32-33, 39, 41, 45, 53, 62, 67); and
- District agents threatened Plaintiff with civil liability and imprisonment if he failed to conform his testimony regarding the shooting to that of Bhatt (Dkt. No. 29, 26:16-18.)

These allegations are insufficient to state a claim for IIED against the individual Defendants. That Smith and Minor may have said that Plaintiff's allegations were false, and in Smith's case, that the sentiment may have been repeated in a conversation with a District board member, is not sufficiently outrageous to give rise to an IIED claim. "In order to be considered outrageous, the conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Tekle v. United* States, 511 F.3d 839, 855 (9th Cir. 2007) (citation and internal quotation marks omitted). With respect to the third category of allegations "when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances" the conduct cannot be said to be extreme or outrageous for purposes of an IIED claim. *Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 160 (1987). Finally, the comments of attorneys Olsen, Edrington, and Marzan cannot be a basis for liability as to the individual Defendants.

Accordingly, Defendants' motion to dismiss Plaintiff's IIED claim is granted.

//
//

**CONCLUSION**

For the reasons explained above, the Court hereby GRANTS Defendants' motion to dismiss in part and DENIES it in part. Plaintiff may file a second amended complaint within 30 days of the date of this Order.

This Order disposes of Docket Nos. 16 & 24.

**IT IS SO ORDERED**.

Dated: December 9, 2013

_____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE